# 21-1901-cr

United States Court of Appeals
For the Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

-against-

ELIAS POLANCO, also known as "Sealed Defendant 2,"

*Defendant,*

and

CHRISTIAN NIEVES, also known as "Sealed Defendant 1,"

*Defendant-Appellant.*

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF FOR DEFENDANT–APPELLANT CHRISTIAN NIEVES**

Edward S. Zas
Federal Defenders of New York, Inc.
 Appeals Bureau
52 Duane Street, 10th Floor
New York, New York 10007
(212) 417-8742

*Counsel for Christian Nieves*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................... iii

STATEMENT OF JURISDICTION ............................................... 1

STATEMENT OF THE ISSUE ..................................................... 1

STATEMENT OF THE CASE ....................................................... 2

STATEMENT OF FACTS ............................................................. 4

   A.  The Charges ..................................................................... 4

   B.  The Parties' Proposed Voir Dire Questions .......................... 5

   C.  Voir Dire ......................................................................... 8

   D.  Trial ............................................................................... 18

       1.   The Government's Case................................................ 18

       2.   The Verdict .............................................................. 24

   E.  Sentencing ...................................................................... 24

SUMMARY OF ARGUMENT ...................................................... 25

ARGUMENT ............................................................................ 29

The District Court's truncated jury selection process denied
Appellant a fair trial ................................................................ 29

   A.  This Court reviews the process of jury selection for
       abuse of discretion.......................................................... 29

   B.  The District Court committed reversible error during voir
       dire by failing to ask any questions that could expose bias
       against gang members .......................................................... 30

       1.   Applicable legal principles ............................................ 30

       2.   On the facts of this case, the District Court abused its
           discretion by refusing to ask even one question that
           could expose gang bias ................................................ 35

3.    The District Court's reasons for its conduct were erroneous ............................................................ 48

4.    The error requires reversal ......................................... 54

C.  The District Court committed reversible error during voir dire by failing to elicit even basic information that would allow the parties to exercise their peremptory challenges intelligently ..................................... 55

1.    Applicable legal principles ........................................... 55

2.    The District Court's perfunctory voir dire prevented defense counsel from being able to exercise peremptory challenges intelligently ............................ 58

3.    The District Court's justification for its cursory voir dire was premised on a legal error ...................... 62

4.    The error requires reversal ......................................... 63

D.  Alternatively, the cumulative effect of the District Court's voir dire errors requires reversal......................................... 64

CONCLUSION ................................................................................ 67

CERTIFICATE OF SERVICE...................................................... 68

CERTIFICATE OF COMPLIANCE............................................. 69

# TABLE OF AUTHORITIES

## Federal Cases

*Aldridge v. United States*,
283 U.S. 308 (1931).................................................................31, 32

*Barfield v. Orange Cty.*,
911 F.2d 644 (11th Cir. 1990)..........................................................61

*Brown v. Kelly*,
973 F.2d 116 (2d Cir. 1992) ..............................................................61

*Gardner v. Barnett*,
175 F.3d 580 (7th Cir.), *vacated*, 199 F.3d 915
(7th Cir. 1999) (en banc) ......................................................44, 45, 46

*Gardner v. Barnett*,
199 F.3d 915 (7th Cir. 1999) (en banc).......................................46, 47

*Gomez v. United States*,
490 U.S. 858 (1989)..........................................................................30

*Ham v. South Carolina*,
409 U.S. 524 (1973)..........................................................................31

*Holland v. Illinois*,
493 U.S. 474 (1990)..........................................................................56

*Ida v. United States*,
191 F. Supp. 2d 426 (S.D.N.Y. 2002)................................................53

*J.E.B. v. Alabama ex rel. T.B.*,
511 U.S. 127 (1994)..........................................................................61

*Koon v. United States*,
518 U.S. 81 (1996)............................................................................59

*Lewis v. United States*,
146 U.S. 370 (1892)..........................................................................28

*McCrory v. Henderson*,
82 F.3d 1243 (2d Cir. 1996) .............................................................56

*McDonough Power Equip., Inc. v. Greenwood*,
464 U.S. 548 (1984)..........................................................................30

*Morgan v. Illinois*,
504 U.S. 719 (1992)..........................................................................30

*Parker v. Gladden*,
385 U.S. 363 (1966)..........................................................................54

iii

*Press-Enterprise Co. v. Superior Ct.*,
  464 U.S. 501 (1984) .................................................................. 50
*Ristaino v. Ross*,
  424 U.S. 589 (1976) ................................................................. 32
*Rosales-Lopez v. United States*,
  451 U.S. 182 (1981) .......................................................... passim
*Spells v. United States*,
  263 F.2d 609 (5th Cir. 1959) ................................................. 60
*Swain v. Alabama*,
  380 U.S. 202 (1965), *overruled on other grounds by*
  *Batson v. Kentucky*, 476 U.S. 79 (1986) ........................ 56, 63
*Turner v. Murray*,
  476 U.S. 28 (1986) ................................................................. 32
*United States v. Abel*,
  469 U.S. 45 (1984) ................................................................. 37
*United States v. Al-Moayad*,
  545 F.3d 139 (2d Cir. 2008) ................................................... 65
*United States v. Barnes*,
  604 F.2d 121 (2d Cir. 1979) ................................... 33, 40, 55
*United States v. Blouin*,
  666 F.2d 796 (2d Cir. 1981) ..................................................... 8
*United States v. Bove*,
  888 F.3d 606 (2d Cir. 2018) ................................................... 29
*United States v. Carpenter*,
  108 F.3d 1380 (Table), 1997 WL 117273 (7th Cir. 1997) ............ 38
*United States v. Cassel*,
  668 F.2d 969 (8th Cir. 1982) ................................................. 33
*United States v. Colombo*,
  869 F.2d 149 (2d Cir. 1989) ........................................... 26, 63
*United States v. Dellinger*,
  472 F.2d 340 (7th Cir. 1972) ......................................... 34, 63
*United States v. Easter*,
  66 F.3d 1018 (9th Cir. 1995) ................................................. 38
*United States v. Haldeman*,
  559 F.2d 31 (D.C. Cir. 1976) ................................................. 60
*United States v. Harbin*,
  250 F.3d 532 (7th Cir. 2001) ................................................. 64

iv

*United States v. Harris*,
  87 F.3d 860 (7th Cir. 1996)..............................................36, 37
*United States v. Lancaster*,
  96 F.3d 734 (4th Cir. 1996) (en banc)............................33, 43
*United States v. Lawes*,
  292 F.3d 123 (2d Cir. 2002) ........................................ passim
*United States v. Lazo*,
  816 F. App'x 752 (4th Cir. 2020), *cert. denied,*
  141 S. Ct. 1429 (2021)........................................................39
*United States v. Ledee*,
  549 F.2d 990 (5th Cir. 1977)..............................................57
*United States v. Martinez-Salazar*,
  528 U.S. 304 (2000).............................................56, 63, 64
*United States v. Morales*,
  185 F.3d 74 (2d Cir. 1999) .................................................29
*United States v. Parse*,
  789 F.3d 83 (2d Cir. 2015) .................................................54
*United States v. Quinones*,
  511 F.3d 289 (2d Cir. 2007) ..............................................31
*United States v. Rahman*,
  189 F.3d 88 (2d Cir. 1999) ...........................................65, 66
*United States v. Ramirez*,
  10 F. App'x 453 (9th Cir. 2001)..........................................39
*United States v. Reyes*,
  No. 11 Cr. 1 (MRK), 2012 WL 3727995 (D. Conn. May 1, 2012) ........37
*United States v. Sargent*,
  98 F.3d 325 (7th Cir. 1996).................................................36
*United States v. Smith*,
  919 F.3d 825 (4th Cir. 2019).............................................52
*United States v. Tocco*,
  200 F.3d 401 (6th Cir. 2000).............................................52
*United States v. Torres*,
  128 F.3d 38 (2d Cir. 1997) .................................................56
*United States v. Treacy*,
  639 F.3d 32 (2d Cir. 2011) .................................................34
*United States v. Tutino*,
  883 F.2d 1125 (2d Cir. 1989) ............................................33

*United States v. Wright,*
  536 F.3d 819 (8th Cir. 2008).............................................................38
*Zervos v. Verizon New York, Inc.,*
  252 F.3d 163 (2d Cir. 2001) ..............................................................29

## State Cases

*Commonwealth v. Lon,*
  964 N.E.2d 368 (Table), 2012 WL 987512
  (Mass. App. Ct. 2012) (unpublished)..................................................39
*Cousins v. Commonwealth,*
  693 S.E.2d 283 (Va. Ct. App. 2010) ...................................................40
*People v. Jimenez,*
  672 N.E.2d 914 (Ill. App. Ct. 1996) .......................................37, 48, 66
*People v. Orona,*
  No. F057931, 2011 WL 94171
  (Cal. Ct. App. Jan. 12, 2011) (unpublished)......................................38
*People v. Strain,*
  742 N.E.2d 315 (Ill. 2000)......................................................38, 40, 47
*People v. Strain,*
  714 N.E.2d 74 (Ill. App. Ct. 1999), *aff'd*, 742 N.E.2d 315 (Ill. 2000)..38
*State v. Lugo,*
  835 A.2d 451 (Conn. 2003)...............................................................43

## Federal Constitutional Provisions and Statutes

U.S. Const. amend. V ................................................................ passim
U.S. Const. amend. VI ............................................................... passim
18 U.S.C. § 1512(b)(3).....................................................................4
18 U.S.C. § 1512(k).........................................................................5
18 U.S.C. § 1513(b)(1)..................................................................3, 4
18 U.S.C. § 1513(f).........................................................................4
18 U.S.C. § 3231 ............................................................................1
28 U.S.C. § 1291 ............................................................................1
28 U.S.C. § 2254 .....................................................................44, 46

## Federal Rules

Fed. R. Crim. P. 24 ........................................................................28

vi

## Other Authorities

Press Release No. 14-209, United States Attorney's Office for the
    Southern District of New York, *National Leader of "Trinitarios"*
    *Gang Sentenced in Manhattan Federal Court to 19 Years in Prison*
    (July 25, 2014), https://www.justice.gov/usao-sdny/pr/national-
    leader-trinitarios-gang-sentenced-manhattan-federal-court-19-
    years-prison ........................................................................................... 2

Romero, Mary, *State Violence, and the Social and Legal Construction*
    *of Latino Criminality: From El Bandido to Gang Member,*
    78 Denv. U. L. Rev. 1081 (2001) ........................................................ 42

Woods, Jordan Blair, *Systemic Racial Bias and RICO's Application*
    *to Criminal Street and Prison Gangs,*
    17 Mich. J. Race & L. 303 (2012) ...................................................... 42

## STATEMENT OF JURISDICTION

Christian Nieves[1] appeals from a final judgment of conviction and sentence entered on July 30, 2021, in the United States District Court for the Southern District of New York (Hon. Jed S. Rakoff). Appendix ("A.") 1206-12. A notice of appeal was timely filed on August 2, 2021. A. 1213. This Court has jurisdiction under 28 U.S.C. § 1291. The District Court had jurisdiction under 18 U.S.C. § 3231.

## STATEMENT OF THE ISSUE

A district court commits reversible error during jury selection when (1) it fails "to inquire about, or warn against, a systematic or pervasive bias, including one that may be short-lived but existent at the time of trial, in the community that would have been cured by asking a question posed by a party," or (2) "voir dire [is] so demonstrably brief and lacking in substance as to afford counsel too little information even to draw any conclusions about a potential juror's general outlook, experience, communication skills,

---

[1] Mr. Nieves's real name is Eric Rosario, Jr. *See* Presentence Investigation Report, Sentencing Recommendation, at 28. This brief refers to him as Christian Nieves, the name under which he was indicted.

1

intelligence, or life-style." *United States v. Lawes*, 292 F.3d 123, 129 (2d Cir. 2002) (citations omitted).

The question presented is: In a prosecution centered around membership in a violent Latino gang and alleged retaliatory gang-related violence, did the District Court commit reversible error during jury selection by refusing, over timely objection, and based on legal errors, to ask prospective jurors any questions that (1) could expose systematic or pervasive bias or other attitudes towards gangs; or (2) would allow the parties "even to draw any conclusions about a potential juror's general outlook, experience, communication skills, intelligence, or life-style," *Lawes*, 292 F.3d at 129?

## STATEMENT OF THE CASE

Christian Nieves is a 29-year-old American citizen who once belonged to the Trinitarios, the notorious Latino prison-and-street gang.[2] He was convicted, following a jury trial, of one count of

---

[2] According to the Government, the Trinitarios are "a violent street and prison gang comprising primarily individuals of Dominican descent." Press Release No. 14-209, United States Attorney's Office for the Southern District of New York, *National Leader of "Trinitarios" Gang Sentenced in Manhattan Federal Court to 19 Years in Prison* (July 25, 2014), https://www.justice.gov/usao-sdny/pr/national-leader-trinitarios-gang-sentenced-manhattan-

2

witness retaliation, in violation of 18 U.S.C. § 1513(b)(1), for which he was sentenced principally to 36 months in prison.[3] The conviction arose from a 2019 altercation between Nieves and Miguel Carela, another Trinitario who had testified for the Government at a 2018 gang-related criminal trial. The jury acquitted Nieves and his co-defendant Elias Polanco of a separate count charging them with conspiring to tamper with a witness, and the District Court granted a judgment of acquittal on a third count charging Nieves with a substantive count of witness tampering.

Nieves appeals because the District Court's perfunctory jury selection process — in particular, its refusal to ask prospective jurors any questions that could expose their bias towards gangs or even basic questions about their general life experiences and attitudes —

_____

federal-court-19-years-prison. Created in 1992, the gang is "a dangerous and bloodthirsty organization … responsible for overwhelming violence both on the streets of New York and [in] other cities, and inside the prison system." *Id.*

[3] Section 1513(b)(1) makes it a crime to "knowingly engage[] in any conduct and thereby cause[] bodily injury to another person or damage[] the tangible property of another person, or threaten[] to do so, with intent to retaliate against any person for … the attendance of a witness or party at an official proceeding, or any testimony given or any record, document, or other object produced by a witness in an official proceeding."

violated Supreme Court and Second Circuit precedent, and denied

him a fundamentally fair trial.

## STATEMENT OF FACTS

### A. The Charges

Nieves and Carela were both members of the Trinitarios. On

February 5, 2019, Nieves allegedly attacked Carela on a sidewalk in

the Bronx and slashed him with a razor. The Government claimed

that this attack, which was recorded from a distance by a video

surveillance camera (*see* Government Exhibits 401Z & 404), was in

retaliation for testimony Carela had given against a rival gang

member at a July 2018 federal trial.

In May 2019, a grand jury in the Southern District of New York

returned a four-count indictment against Nieves and another

Trinitario, Elias Polanco. A. 21-26. Count One charged Nieves alone

with witness retaliation, in violation of 18 U.S.C. § 1513(b)(1). A. 21.

Count Two charged Nieves and Polanco with conspiring to commit

witness retaliation, in violation of 18 U.S.C. § 1513(f). A. 22. Count

Three charged Nieves alone with witness intimidation, in violation of

18 U.S.C. § 1512(b)(3), and Count Four charged both defendants with

4

conspiracy to commit witness intimidation, in violation of 18 U.S.C. § 1512(k). A. 22-23. These intimidation charges were based on an alleged phone call made by Nieves and Polanco to Carela the day after his altercation with Nieves.

Before trial, the Government dropped Count Two, the conspiracy-to-retaliate count, after conceding that Carela had likely misidentified Polanco as being present with Nieves at the scene of the alleged retaliatory attack. A. 1120 n.1.

Both defendants were tried together on the remaining three counts in April 2021, under COVID-19 safety protocols, including mandatory mask-wearing.

## B. The Parties' Proposed Voir Dire Questions

Before trial, all parties, including the Government, recognized the need for the court to tell prospective jurors this was a gang case and to ask at least some brief questions that could reveal potential bias towards, or other strong feelings about, street gangs. The Government, for example, proposed the following gang-focused voir dire questions:

5

29. Have any of you or any member of your family been
    involved as a defendant or in any other way with a case
    involving a gang or other racketeering activity?

30. Would the fact that one of the charges in this case
    involves racketeering activity, specifically, a gang,
    affect your ability to be fair and impartial in this case?

A. 33.

Similarly, the defendants asked the court to question prospective jurors about whether they had "a particular interest in, or knowledge of … [a]lleged gang or street violence" (A. 50), or had "any personal experiences or feelings arising from any acts of violence that might impact the way you think and feel about this case, or that would affect your impartiality in a case involving alleged gang violence." A. 52. Another proposed question was this one:

5. Do you have a particular interest in, knowledge of,
formal training regarding, or any other significant
exposure to (and if so, please specify):
    a. Organized crime;
    b. Drug dealing;
    c. Street gangs.

A. 52.

6

Because Nieves, Polanco, and Carela (and the Trinitarios as a group) identified as Latino, the defendants also asked the court to question the venire about their views, if any, "of Latino Americans." A. 51 (Question 2); *see also id.* (Question 4) ("Do you have any negative feelings, stereotypes, or opinions about Latino Americans?").

In addition, all parties asked the court to question potential jurors generally about, among other topics, their feelings toward law enforcement, their educational background, their favorite newspapers, magazines, and television shows, their hobbies, and whether they or their family members had ever been charged with (or the victim of) a crime, or had seen or heard anything about this case. *See, e.g.*, A. 30-31, 32, 38, 39, 53.

The defendants specifically asked the court to "conduct an individual voir dire of each prospective juror that explores specific concerns related to the circumstances of this case, and potential biases based on the facts, the individuals, or the environment in which the alleged crimes took place. A limited individual voir dire

that asks only superficial pedigree questions is insufficient to ensure the defendants an impartial jury and a fair trial." A. 43.

## C.  Voir Dire

Jury selection began on April 14, 2021, at 10:45 a.m. (*see* A. 58), using the familiar "jury box" method. *See, e.g.*, *United States v. Blouin*, 666 F.2d 796, 796-97 (2d Cir. 1981) (explaining the "jury box" system of jury selection). Jury selection was completed swiftly, less than an hour-and-a-half later, around 12:10 p.m. *See* A. 95 (informing the selected jurors that court would reconvene at 1:10 p.m. so that they would "have a full hour for lunch"). The entire voir dire process consumed less than 38 pages of transcript. *See* A. 58-94.

At the outset of jury selection, the court told the venire this was "a criminal case" expected to last, "at most, two weeks." A. 59. The court explained that it was going to ask questions of the first 12 potential jurors, who were seated in the jury box, but that all members of the venire should listen to the questions because some of the first 12 people "may be excused and then you may be called up in

8

their place and I don't want to have to repeat all of my questions." A. 59-60.

The court then briefly described this case, noting that both defendants were "charged with conspiring to threaten a government witness, named Miguel Car[el]a." A. 60. The court added that Nieves was also charged with assaulting Carela in retaliation for his testimony at a prior trial. A. 60. The court did not tell the potential jurors that Nieves, Polanco, and Carela had all belonged to a gang, or that this case involved allegations of gang violence. The jury would not learn this information until after they were sworn and the prosecutor gave his opening statement. *See* A. 126 (prosecutor's opening statement declaring that Carela and Nieves "belonged to a violent gang called the Trintarios").

The court did explain the presumption of innocence and the concept of reasonable doubt. A. 60. It asked, "Is there any juror among the first 12 who would have a problem following that basic principle?" A. 60. Nobody responded. A. 60.

The court then said, "Every once in a while there is a case — not usually this kind of case — involving some other kinds of crimes

9

that people have such strong feeling about that they don't think they could be fair. But now that you know a little bit about what this case is about, is there any one of the first 12 jurors who thinks they cannot be fair?" A. 60-61. Still unaware this was a gang case, none of the first 12 potential jurors responded. A. 61.

The court ensured that no prospective jurors (or their family members) knew or had any connection to the defendants, lawyers, or witnesses, or worked for any law enforcement agencies. *See* A. 61-66. The court also asked whether any potential jurors had ever been charged with a crime, had ever been a party to a civil lawsuit, or had previously served on a jury in a criminal case. A. 67-68.

The court then conducted an individualized voir dire, limited to these three or four questions:

> Now, I'm going to ask each of you 12 to tell me what county or borough you reside in. We don't need your address, just the county or borough, what you do for a living, whether or not you have a significant other, and if you do, what that significant other does for a living.

A. 69.

The answers to these questions (and, in some instances, to follow-up questions) prompted the court to excuse some prospective

10

jurors for "cause" and to replace them (*see, e.g.*, A. 62 (excusing potential juror whose father was a retired homicide detective)); the others remained in the jury box. The court then directed the lawyers to exercise their peremptory challenges. A. 72. Polanco's counsel objected: "I ask the Court do some further inquiry of these jurors to the type of questions they [sic] submitted for voir dire. I don't believe they've had enough questions to make any cause challenges." A. 72. In response, the court said that "all the questions submitted by counsel for all the parties that were not given by the Court were, after careful study by the Court, rejected by the Court. It was inappropriate or otherwise not useful and your objection is preserved for appeal." A. 73.

Nieves's counsel, Assistant Federal Defender Mark Gombiner, asked the court to pose some questions that might reveal the potential jurors' feelings about "gangs and the Trinitarios," as all parties had requested. A. 73. But the court declined. The colloquy was:

> MR. GOMBINER: Judge, can I raise one point. If there is going to be testimony — sorry. If there is going to be — which the government is seeking to introduce testimony about gangs and the Trinitarios.

11

THE COURT: I thought about that question, but I'm sorry, I'm not giving that question.

MR. GOMBINER: Judge, for the record, I don't think that the questions the Court has asked are sufficient to allow us to meaningfully exercise any peremptory challenges. So we object. Thank you.

A. 73.

The court overruled the objection, stating that it "has a long standing practice of not asking what might be called attitudinal questions. I think that is an invasion of privacy and I also think it is counterproductive and leads to colloquies. Your objection is noted and denied." A. 73.

The parties thus had to exercise their peremptory challenges based on the limited information (essentially, county of residence and occupation) the court had elicited. During that process, one potential juror ("Prospective Juror 13") asked the court to be excused, citing "the nature of the charges." A. 88. At a sidebar, the person explained that the charges made him or her "feel uncomfortable" because of "[m]y own biases." A. 88. When asked to explain which "biases" the person was referring to, Prospective Juror 13 said, "I don't know if they might be gang members." A. 88. The court

12

responded, "So?" A. 88. The person responded, "I don't feel comfortable being involved in such a case." A. 88. The court then excused the prospective juror for cause (A. 89), but took no steps to ensure that other prospective jurors did not harbor similar "biases" toward gangs or gang members.

After the parties completed their peremptory challenges, the court announced to the 12 people in the box (and three alternates) that "you are now our jury." A. 94. Nieves's counsel moved for a mistrial, arguing that "the voir dire was not adequate to allow us to meaningfully exercise our peremptory challenges." A. 116. Counsel noted, *inter alia*, that a more thorough voir dire was especially necessary because the prospective jurors had all been wearing masks, making it impossible to assess their facial expressions. A. 116. The court responded by stating that challenging jurors based on the way they look "would have been overruled by increasingly clear precedent as to how not only irrelevant it is, but how it is just a cover for discrimination." A. 116-17. Counsel disagreed, noting that lawyers commonly "rely very heavily on demeanor evidence" in exercising peremptory challenges. A. 117.

13

Counsel raised another "critical point" — "that the Court's voir dire was limited to asking the jurors what county they lived in, what their occupation was, and what their significant other's [or] partner's occupation is. If a juror did not respond to any of the general questions, we heard the jurors say, in many instances, maybe five or ten words." A. 118.

Counsel also cited Supreme Court precedent emphasizing the "critical function" voir dire plays in ensuring an impartial jury. A. 119. Counsel argued, *inter alia*, that the "'lack of adequate voir dire impairs the defendant's right to exercise peremptory challenges where provided by statute or rule as it is in the federal courts.'" A. 119 (quoting *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981)).

The court rejected these arguments. It ruled that voir dire had been "adequate" and that the court's role was limited to ensuring that prospective jurors "who need to be excused for cause are excused." A. 120. The court said:

> [T]his Court's view is that it needs to question the jurors sufficiently to make sure that any who need to be excused for cause are excused. All my questions are directed towards that and we excused a fair number

14

> based on [their] responses to my questions. I do not view
> it as the role of the Court to have to go beyond that and
> provide more than very basic details about the persons
> who are being questioned….

A. 120.

The court offered "several reasons" for its view. A. 120. First,
the court said, "the typical questions that are asked by counsel in
such a situation … call for indication of the jurors' attitudes, which
in my view is, A, invasion of privacy, B, a source of potential
confusion, and C, and most important, to pursue any attitudinal
questions properly, the Court would have to ask a whole bunch of
follow-up questions, which would inevitably get the Court into a
description of the case in some way or another, which would be
totally improper." A. 120.

Judge Rakoff explained why he "never give[s] those questions,"
a policy he has enforced "forever:"

> I never give those questions. You are right it is not
> limited to this case. This has been my policy forever
> because I think in practice — this was my experience[]
> in the 25 years I was a practicing lawyer — that it
> inevitably gets the judge — if the judge is doing his or
> her job — involved in having to describe the case. So, for
> example, the question about the gangs, which was the
> one specific question you raised at the time, any

15

discussion — you can't describe gangs in the abstract. There are gangs and gangs. In order to ascertain whether a juror had a meaningfully improper view or is biased because the case involved gangs, which is the Court's job when it is looking to excuse someone for cause, the Court would have to inevitably have to get into the description of the facts of the particular case. You could make it a little abstract but it would still be that and that would be totally improper.

For all those reasons, but especially the latter, I think those are not an appropriate role for the Court.

A. 120-21. The court later added that, if it told the prospective jurors this was a gang case, they might fear for their safety. *See* A. 217.

Nieves's counsel further clarified and pressed his objection:

MR. GOMBINER: Just to clarify, judge. My question is not to the Court ask [sic] attitudinal questions. My objection to the Court is not asking even a few questions that would elicit something about the jurors' background. For example, their education, number of children they have.

THE COURT: That's like I get questions all the time, including from your office: Do you read the New York Times? What is your favorite newspaper? Again, which is again a clear invasion of privacy; but putting that aside, what follows from that other than an exercise of stereotyping of people.

MR. GOMBINER: But, Judge, otherwise without any information about the jurors and without even being able to hear them talk which gives you some sense of

16

who they are, there is no basis for exercising the peremptory challenges. That is our objection.

THE COURT: Duly noted; denied.

A. 121-22.

As a consequence of the court's rulings, and even though one prospective juror had already told the court he or she was biased against gangs (prompting excusal for cause, *see* A. 88-89), no other prospective juror was told that this was a gang case, much less questioned on whether he or she could be impartial in a case involving Latino gang members and gang-related violence. Indeed, as far as the record reveals, one or more of the selected jurors may have been members (or victims) of a gang themselves. Nor was any potential juror questioned more generally about his or her attitudes regarding the criminal justice system (or anything else). And while the prospective jurors were asked to state their occupation (and that of their "significant other" if they had one), no questions were asked regarding their educational background, reading habits, lifestyle, outlook, or interests.

17

**D.  Trial**

The central disputed issue at trial was Nieves's intent. Did he intend to retaliate against Carela for testifying, as the Government claimed, or did Nieves and Carela simply engage in a "Bronx street fight" (A. 135) that had nothing to do with his prior testimony, as the defense contended?

**1.    The Government's Case**

The Government attempted to prove Nieves's supposed retaliatory intent in two principal ways: through the testimony of Carela himself and through extensive evidence, including expert testimony, regarding the history, rules, and violent nature of the Trinitarios.

*Carela's Testimony*

Carela, a convicted felon turned Government cooperator, was the Government's main witness. He testified that, on February 5, 2019, a couple of months after he was released from federal prison, Nieves, whom Carela knew only as "White Boy," approached him on a Bronx street and slashed him with a blade, causing a cut on his neck or lower jaw. According to Carela, Nieves called him a "rat"

18

during the incident and said, "This is happening to you for being a
snitch." A. 265-66. Nieves then supposedly ran off with Carela's
wallet, $300 in cash, and some merchandise Carela had been
carrying. A. 266, 453.

Carela's credibility was, to put it mildly, highly questionable.
Indeed, Judge Rakoff expressed deep concern over Carela's veracity,
asking at one point "whether any reasonable juror could find him
truthful." A. 390. And while the court ultimately ruled that it could
not declare Carela incredible "as a matter of law" (A. 847, 1124),
there were numerous reasons to disbelieve key aspects of his story.
Among them:

- Carela, a Trinitario "soldier" since 2008 (A. 237), was an
  admitted violent felon, having pleaded guilty to
  racketeering, drug distribution, possession of a firearm, mail
  theft, and even being an accessory to a murder (A. 220).

- Carela's claim that Nieves had slashed him while calling
  him a "rat" and a "snitch" was uncorroborated. The video
  surveillance was too far away to show anything but Nieves
  and Carela striking each other with their fists, and even

19

Carela described the altercation at one point using terms
consistent with a street fight: "Well, I threw a punch at him
after he threw one at me." A. 444.

- Carela admitted on cross-examination that he had "no idea
  why" Nieves attacked him. A. 453.

- Though Carela testified he had told "everyone" after the
  altercation, including law enforcement, that Nieves had
  called him a "rat" or "snitch" (A. 455-56), none of the law
  enforcement witnesses took any notes that supported
  Carela's testimony on this point.

- While in federal prison, and even after he began cooperating
  with the Government, Carela continued to commit crimes by
  forcing relatives, including his sister, a niece, and the mother
  of one of his sons, to smuggle drugs into the prison. A. 412,
  414-16, 458, 549.

- Carela was an admitted perjurer, having lied to a Bronx
  grand jury about being a Trinitario; he then lied again at this
  federal trial by claiming he could not remember whether he
  had previously admitted lying to the grand jury. *See* A. 387-

20

88, 540, 613. The District Court found Carela's testimony on this point "deeply troubl[ing.]" A. 390.

● Carela's testimony was riddled with myriad other falsehoods, inconsistencies, half-truths, and evasions, prompting Judge Rakoff to wonder whether he is "either a liar or so challenged in his memory that no reasonable juror could rely on his testimony." A. 389; *see generally* Nieves's Post-Trial Motion to Set Aside the Verdict 1-5, Dkt. 124, filed May 28, 2021.

*The Gang Evidence*

Perhaps recognizing Carela's credibility problems, the Government sought to buttress his story by presenting abundant evidence about the criminal history, "anti-snitching" rules, and violent practices of the Trinitarios gang. Thus, in opening statement, the prosecutor's very first words emphasized that Carela and the defendants belonged to "a violent gang called the Trinitarios." A. 126. This case, the prosecutor said, was "about a violent gang" that attacked and threatened Miguel Carela. A. 127. "The evidence will show," the prosecutor added,

> that the defendants belonged to a gang called the
> Trinitarios. You will learn all about that gang. You will

21

learn that for years gang members have engaged in crimes together in the Bronx and elsewhere. You will hear about the inner workings of the gang, it[s] colors, and hand signs and most importantly it[s] rules and punishments. You will hear that the Trinitarios … have a code of silence, a zero tolerance rule about assisting law enforcement, a rule enforced through violence.

A. 127-28.

This theme — the violent and vengeful nature of the Trinitarios — permeated the entire trial. For example, the Government was allowed, over objection, to call an expert witness on the Trinitarios, Detective Paul Jeselson. A former member of the "Bronx Gang Squad" (A. 624), Jeselson told the jury the Trintarios were involved in all sorts of violent criminal activity, including murders (putting "hits" out on people), kidnappings, robberies, and shootings. A. 626. He explained that law enforcement had seized various weapons and contraband from Trinitarios members, including narcotics, firearms, and even "machetes." A. 628. Jeselson also testified that the Trinatarios had a written "constitution" that, among things, set forth the gang's hierarchical structure and demanded that the Trinatarios remain a secret organization. A. 628, 630, 631. The constitution also contained a "code of silence"— a rule

barring gang members from speaking about the gang to outsiders or cooperating with law enforcement. A. 630. A member who violated the code would be called a "traitor" and "severely punished." A. 632. The punishment could include a "physical beating" or even death. A. 634. It was Carela's violation of the code of silence, the Government claimed, that prompted Nieves to assault him.

The Government pounded these themes home in summation. It argued, for example, "that the Trinitarios gang is an organized gang, whose members commit crimes together here in New York City." A. 977. They also "sell drugs" and "fight with other rival gangs, and … commit acts of violence." A. 977. The Government said: "You know that they're organized, that they have a leadership structure, and that members of the gang accrue leadership by going on missions. What are missions? Orders to do things, including acts of violence at the direction of Trinitarios leaders against rivals." A. 977.

While the Government admitted in summation that Carela was a "violent gang member" and perjurer (A. 982), it argued that his testimony about why he was attacked — supposedly for being a "snitch" — "was corroborated as to the nature and organization and

23

rules of the Trinitarios gang by Detective Jeselson and by the gang paperwork, the Trinitarios constitution that you were able to see and to read." A. 986-97.

### 2. The Verdict

The jury found Nieves guilty of witness retaliation (Count One) but acquitted both defendants of Count Four (conspiracy to intimidate). A. 1115. The court had granted a judgment of acquittal on the remaining count, Count Three (substantive witness intimidation), at the close of the Government's case. A. 869.

### E. Sentencing

The District Court sentenced Nieves on July 27, 2021. A. 1167-1205. The court first determined that the Guidelines range of imprisonment was 57-71 months (total offense level 21; Criminal History Category IV). A. 1176. After hearing from the lawyers and Nieves himself, the court decided to impose 36 months of imprisonment, to be followed by three years of supervised release. A. 1202. The court noted that, while the sentence needed to be long enough to "send a message" (A. 1201), the court was persuaded by defense counsel's "excellent presentation about the combination of

24

unfortunate circumstances that led to the mixed-up human being that this defendant has in part become." A. 1202. Those circumstances included Nieves's difficult upbringing (marked by trauma, bullying, and neglect), severe and longstanding substance abuse disorders, mental health struggles, and lack of a stable home. *See* A. 1132-44 (sentencing submission).

The court concluded that there was "more hope here than in some cases, not only because of the indication that the defendant wants to turn his life around and has the support of his family to do so, but, also, that he has never been unilaterally a pathologically criminal personality." A. 1202. Nieves, the court said, "has both good and bad sides to his personality," and the court feared that a long prison term would "increase the tendency towards the bad, not the tendency towards the good." A. 1202.

## SUMMARY OF ARGUMENT

Because "the defense deserves a full and fair opportunity to expose bias or prejudice on the part of veniremen, … [t]here must be sufficient information elicited on *voir dire* to permit a defendant to intelligently exercise not only his challenges for cause, but also his

peremptory challenges." *United States v. Colombo*, 869 F.2d 149, 151 (2d Cir. 1989) (citations and internal quotation marks omitted).[4] That did not happen here. And it did not happen because the District Court, placing efficiency above fundamental fairness, and the jurors' supposed privacy interests above the demands of the Sixth Amendment, refused to ask prospective jurors any gang-related questions — or even to tell the venire this was a gang case. Instead, the court simply assumed — erroneously, as Prospective Juror 13's comments at sidebar later made clear (A. 88) — that this case would not arouse "strong feeling[s]" in any potential juror. A. 60-61. The court then ruled, in violation of this Court's precedents, *see, e.g., Colombo*, *id.*, that its role in jury selection was limited to eliciting just enough information to allow potential jurors to be excused for "cause," not to ensure that the parties also had sufficient information to exercise their peremptory challenges intelligently (A. 120).

Based on these errors, the District Court conducted a hasty, perfunctory, and wholly inadequate voir dire. This case revolved

---

[4] Unless otherwise noted, all subsequent citations to case law and law review articles in this brief omit all alterations, citations, footnotes, and internal quotation marks.

26

from its inception around Nieves's, Polanco's, and Carela's membership in the Trinitarios, the Latino prison-and-street gang notorious for its extreme violence. Thus, all parties, including the Government, recognized before trial that it was important for the District Court to question potential jurors briefly about their biases, preconceptions, and attitudes concerning gangs and gang-related violence. But the District Court, clinging to its inflexible and "long standing practice" of "never" asking any "attitudinal questions" on voir dire (A. 73, 120), refused to pose even a single question about this crucial subject, or even to tell the prospective jurors that this case would concern a gang. On the facts of this case, this refusal constitutes reversible error because there is at least a "reasonable possibility" that gang bias "might have influenced the jury," *Rosales-Lopez*, 451 U.S. at 191. *See* Argument, § B, *infra*.

Making matters worse, the court's hour-and-a-half voir dire was so cursory that it prevented the parties from exercising their peremptory challenges intelligently. A court commits reversible error when "voir dire [is] so demonstrably brief and lacking in substance as to afford counsel too little information even to draw any

27

conclusions about a potential juror's general outlook, experience, communication skills, intelligence, or life-style." *Lawes*, 292 F.3d at 129. Here, the court asked potential jurors only three or four questions requiring a verbal response: (1) which county or borough did they live in; (2) what did they do for a living; (3) did they have a "significant other"; and, (4) if so, what did that "significant other" do for a living. A. 69. These pedigree questions elicited nothing about a potential juror's "general outlook, experience, communication skills, intelligence, or life-style." *Lawes*, 292 F.3d at 129. Thus, they were inadequate to allow counsel to exercise their peremptory challenges intelligently. *See* Argument, § C, *infra*.

Viewed singly or in combination, these voir dire errors denied Nieves his constitutional right to an impartial jury and, in addition, rendered hollow his statutory right to exercise peremptory challenges, *see* Fed. R. Crim. P. 24, a right "essential to the fairness of trial by jury." *Lewis v. United States*, 146 U.S. 370, 376 (1892). Because the errors infected the very framework within which the trial took place, they cannot be dismissed as harmless. A new trial is necessary.

# ARGUMENT

**The District Court's truncated jury selection process denied Appellant a fair trial.**

## A. This Court reviews the process of jury selection for abuse of discretion.

"The process of empaneling a jury is firmly entrusted to the sound discretion of the trial judge and will not be disturbed absent an abuse of this discretion." *United States v. Morales*, 185 F.3d 74, 84 (2d Cir. 1999). "A district court 'abuses' or 'exceeds' the discretion accorded to it when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision — though not necessarily the product of a legal error or a clearly erroneous factual finding — cannot be located within the range of permissible decisions." *Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 169 (2d Cir. 2001).

This Court has repeatedly noted, moreover, that "'abuse of discretion' is a nonpejorative term of art; it implies no misconduct on the part of the district court." *United States v. Bove*, 888 F.3d 606, 607 n.1 (2d Cir. 2018).

29

**B. The District Court committed reversible error during voir dire by failing to ask any questions that could expose bias against gang members.**

### 1. Applicable legal principles

"One touchstone of a fair trial is an impartial trier of fact — a jury capable and willing to decide the case solely on the evidence before it." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984). Thus, the Sixth Amendment guarantees a criminal defendant the right to a trial "by an impartial jury." U.S. Const. amend. VI. "[P]art of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). And jury selection is the "primary means" of protecting that right and of insuring that the jury is "free from ethnic, racial, or political prejudice, ... or predisposition about the defendant's culpability." *Gomez v. United States*, 490 U.S. 858, 873 (1989). Proper questioning of the venire is "critical," because "without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales-Lopez,* 451 U.S. at 188.

30

"Similarly, lack of adequate *voir dire* impairs the defendant's right to exercise peremptory challenges." *Id.*

District judges possess "ample discretion in determining how best to conduct the *voir dire.*" *United States v. Quinones*, 511 F.3d 289, 299 (2d Cir. 2007). But "the essential demands of fairness" circumscribe that discretion. *Aldridge v. United States*, 283 U.S. 308, 310 (1931). In cases presenting a heightened risk of a particular kind of juror prejudice, the Supreme Court has held that the Constitution mandates specific voir dire questions addressed to that prejudice, not just general inquiries on whether a venireperson subjectively believes he or she can render an impartial verdict. For example, in *Ham v. South Carolina*, the Court held that an African-American charged with a drug offense, who contended that law enforcement officers had framed him in retaliation for his civil rights activism, was entitled to voir dire on racial prejudice. 409 U.S. 524, 527 (1973). That result flowed from two factors: Ham's membership in a disfavored racial minority, and the facts of the case, which brought race front and center. "Racial issues were inextricably bound up with the conduct of the trial," and "Ham's reputation as a civil rights

31

activist and the defense he interposed were likely to intensify any prejudice that individual members of the jury might harbor." *Ristaino v. Ross*, 424 U.S. 589, 597 (1976); *see also Turner v. Murray*, 476 U.S. 28, 36-37 (1986) (holding that a capital defendant accused of an interracial crime is entitled to inform venirepersons of the victim's race and question them on racial bias).

In other cases, the Supreme Court has required specific voir dire questions in the exercise of its supervisory authority over the lower federal courts. For example, in *Rosales-Lopez*, the Court held that federal trial judges should ordinarily honor a defendant's request for questioning into racial or ethnic bias. 451 U.S. at 191. The failure to do so is reversible error "where the circumstances of the case indicate that there is a reasonable possibility that racial or ethnic prejudice might have influenced the jury." *Id.* As in *Ham*, in assessing that risk, *Rosales-Lopez* considered both the defendant's ethnicity and the trial proof. 451 U.S. at 192-94; *see also Aldridge*, 283 U.S. at 314-15 (holding that an African-American defendant charged with the murder of a white police officer was entitled to voir dire on racial bias). Both the constitutional and the supervisory

32

decisions therefore recognize that juror bias "can arise from two principal sources: a special reaction to the facts of the particular case, or a special prejudice against the individual defendant that is unrelated to the particular case." *Rosales-Lopez*, 451 U.S. at 196 (Stevens, J., dissenting).

Where, as here, those two sources of bias intersect, a defendant's right to an impartial jury compels a thorough voir dire. These Supreme Court precedents concern racial or ethnic bias. But this Court has extracted from them the broader principle that "[w]hat is required of a trial judge in his conduct of the [v]oir dire … is that he permit at least some questioning with respect to any material issue that may arise, actually or potentially, in the trial." *United States v. Barnes*, 604 F.2d 121, 137 (2d Cir. 1979); *accord United States v. Tutino*, 883 F.2d 1125, 1133 (2d Cir. 1989). A district court "abuses its discretion … if the voir dire does not provide a reasonable assurance that prejudice would be discovered if present." *United States v. Lancaster*, 96 F.3d 734, 740 (4th Cir. 1996) (en banc); *accord, e.g.*, *United States v. Cassel*, 668 F.2d 969, 971

33

(8th Cir. 1982); *United States v. Dellinger*, 472 F.2d 340, 367

(7th Cir. 1972).

To be sure, this Court "appear[s] never to have reversed a

conviction for the failure to ask a particular question on the voir dire

of prospective jurors." *United States v. Treacy*, 639 F.3d 32, 46

(2d Cir. 2011).[5] But, as discussed below, this case does not involve

the mere failure to ask "a particular question." Rather, it involves

the wholesale refusal to ask *any* questions on an entire subject

matter — gangs and gang-related violence — "inextricably bound up

with the conduct of the trial." *Rosales-Lopez*, 451 U.S. at 189. And

---

[5] In *Treacy*, a securities fraud case, this Court held that Judge Rakoff did not abuse his discretion by failing to use a written jury questionnaire during jury selection. 639 F.3d at 47. Nor did he abuse his discretion by declining to "inquire broadly of the prospective jurors" about their biases, if any, "against corporate America generally." *Id.* There, however, the court, among other precautions, specifically asked the venire "whether they could be fair and impartial in a securities or stock fraud case involving a former chief operating officer and president of Monster [Worldwide, Inc.]," *id.* at 36, and "made abundantly clear to all prospective jurors that they must put … bias [against corporate America] out of their minds." *Id.* at 47. No comparable questions or warnings were given here, even though the bias against Latino gang members was likely to be far more systematic and pervasive than the alleged bias in *Treacy* against corporate executives generally. As noted, the court here did not even tell the prospective jurors this was a gang case.

34

the record confirms that at least one potential juror was indeed biased against individuals who belonged to gangs. A. 88. Despite this, the court abused its discretion by taking no steps to ensure that the other potential jurors were not similarly biased.

Under these unusual circumstances, reversal is necessary. As this Court has recognized, "a voir dire may be so insufficient as to call for a reversal" where "'the record viewed as a whole … show[s] … a failure to inquire about, or warn against, a systematic or pervasive bias, including one that may be short-lived but existent at the time of trial, in the community that would have been cured by asking a question posed by a party.'" *Lawes*, 292 F.3d at 129.

This is that case.

## 2. On the facts of this case, the District Court abused its discretion by refusing to ask even one question that could expose gang bias.

Nieves, Polanco, and the Government itself all recognized before trial that the trial evidence would revolve around gang membership and gang-related violence. Thus, they all asked the judge to tell the prospective jurors this crucial information, and then to pose a few brief questions that could expose preconceptions and

35

prejudices about people, like the defendants and the Government's key witness Carela, who belonged to a Latino gang. *See* Statement of Facts, § B, *supra*; A. 33, 50, 51, 52. The District Court's categorical refusal to ask even one of these questions — or even to tell the venire this was a gang case — violated Nieves's right to an impartial jury. This Court should so hold, pursuant to the Sixth Amendment (as in *Ham*), or in the exercise of its supervisory authority (as in *Rosales-Lopez*). Potential jurors — particularly in the New York metropolitan area — are likely to hold strong negative feelings about people who belong to a gang, especially a violent Latino gang like the Trinitarios. Indeed, Prospective Juror 13 admitted to holding such feelings here, prompting his discharge for cause. A. 88-89. The court's unjustified failure to ensure that other prospective jurors either did not harbor similar feelings, or could put such strong feelings aside — and judge this case based solely on the evidence — requires a new trial.

**(a)** Courts have long recognized the "insidious quality" of gang-affiliation evidence and the likelihood that such evidence will "taint a defendant in the eyes of a jury." *United States v. Sargent*, 98 F.3d 325, 328 (7th Cir. 1996); *see United States v. Irvin*, 87 F.3d 860,

36

864 (7th Cir. 1996); *see also United States v. Abel*, 469 U.S. 45, 54 (1984) (recognizing a district court's duty to take steps to minimize undue prejudice stemming from admission of gang-membership evidence); *United States v. Reyes*, No. 11 Cr. 1 (MRK), 2012 WL 3727995, at *2 (D. Conn. May 1, 2012) ("Evidence that a defendant is a member of a gang can be highly prejudicial.... Alleged membership in the Bloods, a notorious nationwide street gang, is potentially even more prejudicial than general gang membership.").

In *Irvin*, the Seventh Circuit explained that "[t]here is … always the possibility that a jury will attach a propensity for committing crimes to defendants who are affiliated with gangs or that a jury's negative feelings toward gangs will influence its verdict. Guilt by association is a genuine concern whenever gang evidence is admitted." *Irvin*, 87 F.3d at 865; *see also People v. Jimenez*, 672 N.E.2d 914, 917 (Ill. App. Ct. 1996) ("Gang membership is an area of potential bias, as there is widespread prejudice against street gangs.").

In light of these concerns, courts have recognized that special care must be taken when choosing a jury in a gang case. *See, e.g.*,

37

*People v. Strain*, 714 N.E.2d 74, 79 (Ill. App. Ct. 1999) ("Conducting *voir dire* in gang cases presents particular challenges since gang membership is an area of potential bias."), *aff'd*, 742 N.E.2d 315 (Ill. 2000); *People v. Orona*, No. F057931, 2011 WL 94171, at *9 (Cal. Ct. App. Jan. 12, 2011) (unpublished) ("[T]he notion that voir dire in a gang case might present challenges absent from a non-gang case should be no surprise."). Indeed, courts regularly undertake specific questioning to ensure that juries in gang cases are free from bias. *E.g.*, *United States v. Wright,* 536 F.3d 819, 821-23 (8th Cir. 2008) (noting that the district court used a written jury questionnaire to probe for bias against gang members); *United States v. Carpenter*, 108 F.3d 1380 (Table), 1997 WL 117273, at *3 (7th Cir. 1997) (noting that the district court "took the precautions of permitting inquiries at voir dire into the prospective jurors' attitudes about gang membership"); *United States v. Easter*, 66 F.3d 1018, 1021 (9th Cir. 1995) (noting with approval that, in a case involving gang-affiliation evidence, the district court "probed potential jurors, during voir dire, on the issue of bias due to gang affiliation" and "dismissed three potential jurors who indicated that such evidence

38

might influence their deliberations"); *United States v. Ramirez*, 10 F. App'x 453, 453 (9th Cir. 2001) (noting that "the trial judge questioned jurors about potential gang bias and dismissed at least one juror on such grounds"); *Commonwealth v. Lon*, 964 N.E.2d 368 (Table), 2012 WL 987512, at *2 (Mass. App. Ct. 2012) (unpublished) (noting that "[t]he [trial] judge had engaged in probing and detailed individual voir dire of potential jurors, telling them that gang evidence may be involved in the trial, and inquiring of the potential juror's ability to remain impartial."). At the very least, courts, upon request, warn potential jurors that the case will involve gang-related evidence so that bias may be discovered. *E.g., United States v. Lazo*, 816 F. App'x 752, 761 (4th Cir. 2020) ("The [trial] court next explained to the potential jurors that the case involved the MS-13 street gang and that it was critical that any jurors chosen to serve be able to adjudicate the case without bias."), *cert. denied*, 141 S. Ct. 1429 (2021).

Further, courts have held that, where a trial will concern gangs and gang-related violence, a trial court *must* undertake (or allow counsel to undertake) at least *some* inquiry into potential gang

39

bias. *See, e.g.*, *Cousins v. Commonwealth*, 693 S.E.2d 283, 294

(Va. Ct. App. 2010) (holding that, when evidence of gang

membership "will be squarely before the jury," the defendant "is

entitled to *voir dire* the venire panel regarding this issue" to expose

"possible bias resulting from gang membership"); *Strain*, 742

N.E.2d at 321. These decisions, moreover, are just specific

applications of the principle that this Court (and the Supreme

Court) have repeatedly endorsed. *See, e.g.*, *Barnes*, 604 F.2d at 139

("The possibility of prejudice is real, and there is consequent need for

a searching voir dire examination, in situations where, for example,

the case carries racial overtones, or involves other matters

concerning which either the local community or the population at

large is commonly known to harbor strong feelings that may stop

short of presumptive bias in law yet significantly skew deliberations

in fact.").

**(b)** In this case, the persona of the Trinitarios ran like a thread

through the fabric of the trial. From opening statement onwards, the

Government emphasized the violent and vengeful nature of the

Trinitarios. The jury heard evidence about the history of the

Trinitarios, the gang's violent methods, its strict "anti-snitching" rules, and the defendants' association with the Trinitarios. The Government even called an expert witness to explain that violating the gang's "code of silence" required punishment, which could include a physical beating or even death. A. 634.

Given the prosecution's emphasis on the Trinitarios gang as central to the case, and the powerful community bias against gangs and gang members, identifying gang bias among prospective jurors was essential to a fair and adequate voir dire. The District Court, however, failed to ask prospective jurors any of the questions submitted by the defense and by the Government — or any questions of its own — probing for gang bias. Indeed, the court did not even tell the venire this trial would involve allegations of gang membership and gang violence. Instead, the court simply assumed that these allegations would not trigger "strong feeling[s]" among the venire. A. 60-61. Prospective Juror 13's comments at sidebar proved this assumption to be wrong. *See* A. 88-89.

Moreover, the need for an inquiry into potential gang bias was especially important because the Trinitarios identify as a Latino

41

(specifically, Dominican) gang. Thus, absent careful voir dire, there was a real danger that potential jurors would not only bring into the courtroom biases towards gang members, but related racial and ethnic prejudice against Latinos as well. *See* Jordan Blair Woods, *Systemic Racial Bias and RICO's Application to Criminal Street and Prison Gangs*, 17 Mich. J. Race & L. 303, 337 (2012) ("American culture and media have disseminated damaging stereotypes of racial minorities as gang members to such an extent that perceptions of gangs and gang activity cannot be disassociated from these racial stereotypes."); Mary Romero, *State Violence, and the Social and Legal Construction of Latino Criminality: From El Bandido to Gang Member*, 78 Denv. U. L. Rev. 1081, 1095 (2001) ("The most widely distributed representation of Latino youth today is as a gang member."). The combination of gang-related and racial prejudice, which the voir dire here did nothing to probe, could easily have tipped the jury to convict, at least in part, because Nieves was a member of a violent Latino gang, not because the Government had proven beyond a reasonable doubt that he had the specific retaliatory intent required by § 1513(b).

42

This is also not a case in which the trial court merely asked too few gang-related questions, or where other questions adequately covered the subject of gang bias. Rather, the court conducted no inquiry into gang bias at all. *Cf. State v. Lugo*, 835 A.2d 451, 459 (Conn. 2003) (holding that no reversible error occurred because the trial court "did not preclude defense counsel from asking [prospective jurors] questions on the subject matter of gangs but, rather, [only] precluded defense counsel from asking questions specifically concerning the Latin Kings). The court asked only a few standard questions of prospective jurors, including whether they might have issues with the presumption of innocence or the burden of proof — without ever telling them this was a gang case. A. 60. Thus, the record fails to provide, as it must, "reasonable assurance that prejudice [against gangs] would be discovered if present." *Lancaster*, 96 F.3d at 740.

**(c)** While the Constitution does not automatically require inquiry into prospective jurors' gang bias in every case, where, as here, there was the promise of extensive evidence of the defendants' Latino gang affiliation, where the persona of the Trinitarios was

43

central to the case, and where all parties requested an inquiry into gang bias, the District Court's failure to pose any questions (or warnings) concerning gang bias violated Nieves's constitutional right to a jury free of bias and prejudice.

Under these unusual circumstances, the case law calls for reversal. In *Gardner v. Barnett*, 175 F.3d 580 (7th Cir.), *vacated*, 199 F.3d 915 (7th Cir. 1999) (en banc), Gardner was convicted in state court of murder in connection with the fatal gang-related shooting of a student. Gardner later sought 28 U.S.C. § 2254 relief, arguing that the trial court's refusal to thoroughly question prospective jurors about gang bias denied him a fair trial. A divided panel of the Seventh Circuit agreed. Like this Court, the *Gardner* panel recognized that the Constitution "does not dictate a catechism for void dire," and that "there is no right to have particular questions asked." 175 F.3d at 588. Nevertheless, the Circuit ruled that the trial court erred by asking prospective jurors only one of four proposed questions relating to gangs: namely, whether the jurors or their immediate family "ever had direct involvement with a street gang." *Id.* at 588-89. The Circuit recognized that "[o]ur society takes

44

a very dim and undiscriminating view of street gangs," such that "jurors may automatically see in gang members the taint of criminality." *Id.* at 589. The court noted "that evidence of gang association may have an unduly suggestive and distorting effect on a jury." *Id.* The court further noted that, in Gardner's case, "the persona of the street gang ran like a thread through the fabric of the trial." *Id.* The prosecutor "emphasized the case's immersion in gang lore," and told the jury "about Gardner's membership in the gang, his association with other gang members on the day of the shooting, the provocative 'trash-talking' of the gang members, the gang-motivated confrontation with the football players, and ultimately, the gang-beating and gang-shooting of [the victim]." *Id.*

Given the prosecution's emphasis on gangs as central to the case and the powerful bias against membership in gangs, the Seventh Circuit held that "identifying gang bias among prospective jurors was essential to an adequate *voir dire*." *Id.* But "[t]he prospective jurors were asked only whether they or any member of their immediate family had ever had any involvement — direct or indirect — with street gangs." *Id.* This approach was insufficient to

45

assure the defendant "the adequate *voir dire* to which he is constitutionally entitled." *Id.* at 590.

The same is true here. While the Seventh Circuit, in a divided en banc decision, later reinstated Gardner's conviction (and vacated the panel's opinion), *see Gardner v. Barnett*, 199 F.3d 915 (7th Cir. 1999) (en banc), it did so for reasons that have no application here. First, the en banc court held that the trial judge "did ask questions to discover who among the panel had familiarity with gangs through experience." *Id.* at 921. On that basis, the Circuit ruled that Gardner's case was "much different" from other cases — like this one — where "the trial court refused to ask *any* questions that could expose jurors' knowledge of or predisposition against gangs." *Id.* Second, because Gardner's was a § 2254 case, he had to show not only that the state courts' decisions were erroneous, but that they were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(g)(1); 199

46

F.3d at 918, 921. That demanding standard does not apply on this direct appeal.[6]

*People v. Strain*, 742 N.E.2d 315 (Ill. 2000), also supports reversal. There, the Illinois Supreme Court recognized that "street gangs are regarded with considerable disfavor by other segments of our society." *Id.* at 320. Moreover, "particularly in metropolitan areas, there may be strong prejudice against street gangs." *Id.* Accordingly, "when testimony regarding gang membership and gang-related activity is to be an integral part of the defendant's trial, the defendant must be afforded an opportunity to question the prospective jurors, either directly or through questions submitted to the trial court, concerning gang bias." *Id.* at 321.

---

[6] The en banc *Gardner* court also suggested that "lengthy inquiries into possible predispositions against gangs" are "not necessary" in "areas of suburbia where gangs and street crime are not pervasive and the only knowledge of gangs [may be] hanging out with 'the gang' after school." 199 F.3d at 921. The New York-area jury here, however, was not from "suburbia," and undoubtedly knew that the word "gang" does not refer to the friends they may have played with as children "after school." Thus, asking the prospective jurors whether they were biased against gangs would have caused no unfair prejudice or confusion.

In *Jimenez*, 672 N.E.2d 914, the court similarly recognized that "[g]ang membership is an area of potential bias, as there is widespread prejudice against street gangs." *Id.* at 917. It held that the trial court in that case "refused to ask the venire any questions that could probe for this bias. Because of the complete lack of questioning on this issue defendant could not exercise his peremptory challenges intelligently." *Id.* And the voir dire was also inadequate to "reveal prejudice against gang members." *Id.*

These cases support reversal here. As in these cases, the District Court failed "to inquire about, or warn against, a systematic or pervasive bias … in the community that would have been cured by asking a question posed by a party." *Lawes*, 292 F.3d at 129. Thus, a new trial is necessary.

### 3.    The District Court's reasons for its conduct were erroneous.

The District Court gave five reasons for refusing to tell prospective jurors this was a gang case, or to ask them any gang-related questions. None of those reasons justified the court's conduct.

48

First, the court cited its "long standing practice of not asking what might be called attitudinal questions." A. 73. But the fact that the District Court has a longstanding practice of "never" asking questions that could reveal a potential juror's attitudes (A. 120) does not make the practice constitutional or proper. (In fact, as discussed *infra*, § C, the court's rigid practice undermines a fundamental purpose of voir dire — namely, to reveal jurors' attitudes.)

Second, the court ruled that asking about gang bias would invade potential jurors' "privacy." A. 73. While courts should always be sensitive to a potential juror's legitimate privacy concerns, the key question here — whether the potential jurors could be impartial in a case centered around Latino gang members and gang violence — was directly relevant under the Sixth Amendment and, indeed, was "inextricably bound up with the conduct of the trial." *Rosales-Lopez*, 451 U.S. at 189. The question was a far cry from the kinds of irrelevant and "offensively invasive" inquiries likely to provoke a valid privacy objection from a juror. *Cf., e.g., United States v. Holck*, 398 F. Supp. 2d 338, 368-70 (E.D. Pa. 2005) (ruling that prospective jurors had a valid privacy interest in not disclosing their

49

incomes and other sensitive financial information), *aff'd sub nom.*
*United States v. Kemp*, 500 F.3d 257 (3d Cir. 2007). In any event, if
the court had probed for gang bias, and if a potential juror had
raised a privacy concern — neither of which happened — juror
privacy could have been respected by simply instructing the person
to express his or her views at a sidebar, just as Prospective Juror 13
did (*see* A. 88-89), and, if warranted, sealing that portion of the
transcript. *See Press-Enterprise Co. v. Superior Ct.,* 464 U.S. 501,
511 (1984) ("The jury selection process may, in some circumstances,
give rise to a compelling interest of a prospective juror when
interrogation touches on deeply personal matters that person has
legitimate reasons for keeping out of the public domain."). Instead,
the court violated the Sixth Amendment by undertaking no inquiry
into gang bias at all.

Third, the court expressed concern about inviting "colloquies."
A. 73. But probing briefly for gang-related bias would not have
required colloquies or taken much time. The court could simply have
told the venire, as all parties had requested, that this case would
involve evidence about Latino gang members and gang-related

50

violence, and then asked the venire as a group if anyone had strong feelings that might prevent them from being impartial. If the answer to that question was no, the matter would have been resolved. And if the answer was yes, the judge would have had an obligation to inquire further. That inquiry might have extended the voir dire process briefly, but the goal of picking a jury quickly cannot be allowed to trump a defendant's right to a fundamentally fair trial by an impartial jury.

Fourth, the court ruled that probing for gang bias would require the court to involve itself in an extended discussion of the facts of the case, which would be "totally improper." A. 120. Again, this was untrue. New Yorkers know what a street gang is. Telling the prospective jurors that this case would involve allegations of gang membership and gang violence would not have required the court to expound at length on the facts of the case in an improper way.

Finally, the court expressed concern that, if potential jurors were told this was a gang case, they might fear serving as jurors because of potential retaliation by the defendants (or the

51

Trinitarios). A. 217. That concern only highlights the need for adequate voir dire — and the court's error in failing to provide it. This jury was inevitably going to learn at trial (indeed, in opening statements) that this was a gang case, that defendants (and Carela) were members of the Trinitarios, and that the gang was extremely violent. Not telling prospective jurors this crucial information before they were selected did not solve the problem of potentially fearful or biased jurors — it only ensured that any fears and biases would go undetected and unaddressed, to Nieves's great detriment. *Cf. United States v. Smith*, 919 F.3d 825, 824 (4th Cir. 2019) (commending the trial court for taking careful steps, including individualized voir dire, to ensure that jurors' "fears of gang retaliation" did not create bias).

In analogous contexts — a Mafia case, for example — it would be error to refuse, over objection, to tell potential jurors that the case involved allegations about the Mafia or to probe for anti-Italian or similar biases. See *United States v. Tocco*, 200 F.3d 401, 413 (6th Cir. 2000) (holding that it was "a mistake" to tell prospective jurors that the defendants were accused of participating in a

52

conspiracy called "Cosa Nostra" or the "Mafia," without also asking "more specific questions regarding Mafia or Italian-American prejudice," but declining to reverse where the voir dire "sufficiently explored the prospective jurors' knowledge about the Mafia-related case and their ability to be fair and impartial"); *cf. Ida v. United States*, 191 F. Supp. 2d 426, 428 (S.D.N.Y. 2002) (noting that the court asked all prospective jurors "whether they thought it more likely that a person of Italian descent would commit the crimes charged, whether they had any feelings about persons of Italian descent that would make them unable to evaluate charges against such persons fairly, and whether the fact that the case involved charges of alleged organizations referred to as the Mafia or La Cosa Nostra would prevent them from rendering a fair and impartial verdict based only on the evidence and the Court's instructions"). Similarly, it was an abuse of discretion for the District Court here to take no steps to screen for bias against Latino gang members.

### 4.   The error requires reversal.

Because the District Court did not take steps to ensure that this jury was free from bias against members of a Latino gang, this Court cannot be confident Nieves received a "trial 'by an impartial jury,'" which is a jury "in which all of its members, not just most of them, are free of interest and bias." *United States v. Parse*, 789 F.3d 83, 110-11 (2d Cir. 2015); *see also Parker v. Gladden*, 385 U.S. 363, 366 (1966) (holding that a defendant is "entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors."). As far as the brief voir dire transcript discloses, one or more of the selected jurors (like Prospective Juror 13) may have harbored bias against Nieves simply because he belonged to a violent gang. Indeed, given the absence of any questions on the point, it is possible that one of the seated jurors (or a close relative) was actually a rival gang member himself. At a minimum, there is a "reasonable possibility" that some of the jurors "might have" been biased against Latino gang members. *Rosales-Lopez*, 451 U.S. at 191. Accordingly, reversal is necessary.

**C. The District Court committed reversible error during voir dire by failing to elicit even basic information that would allow the parties to exercise their peremptory challenges intelligently.**

As shown, the court's failure to ask any questions relating to possible gang bias — or even to tell the venire this was a gang case— requires reversal. But there is much more that went wrong here. The court also refused to ask any questions that might reveal the jurors' general attitudes about *anything*. That error independently requires a new trial. *See Lawes*, 292 F.3d at 129.

**1. Applicable legal principles**

This Court has recognized that "there must be sufficient information elicited on [v]oir dire to permit a defendant to intelligently exercise not only his challenges for cause, but also his peremptory challenges, the right to which has been specifically acknowledged by the Supreme Court despite the lack of a constitutional statutory source." *Barnes*, 604 F.2d at 142.

The Supreme Court has declared that the peremptory challenge is "one of the most important of the rights secured to the accused," and that "[t]he denial or impairment of the right is

55

reversible error without a showing of prejudice." *Swain v. Alabama,* 380 U.S. 202, 219 (1965), *overruled on other grounds by Batson v. Kentucky*, 476 U.S. 79 (1986); *see also United States v. Martinez-Salazar*, 528 U.S. 304, 311 (2000) ("The peremptory challenge is part of our common-law heritage. Its use in felony trials was already venerable in Blackstone's time. We have long recognized the role of the peremptory challenge in reinforcing a defendant's right to trial by an impartial jury."); *id.* at 316 (noting that a "principal reason for peremptories [is] to help secure the constitutional guarantee of trial by an impartial jury"); *Holland v. Illinois*, 493 U.S. 474, 484 (1990) ("Peremptory challenges, by enabling each side to exclude those jurors it believes will be most partial toward the other side, are a means of eliminating extremes of partiality on both sides, thereby assuring the selection of a qualified *and unbiased* jury.").

Unlike dismissals for cause, which often occur after prospective jurors say "'they are unwilling or unable to follow the applicable law,'" *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997), "[p]eremptory strikes allow the parties to ferret out more subtle biases." *Id.* at 43 n.4; *see also McCrory v. Henderson*, 82 F.3d 1243,

56

1247-48 (2d Cir. 1996) ("The decision to exercise a peremptory challenge, in contrast to a challenge for cause, is subjective; and, often, the reasons behind that decision cannot be easily articulated. … An impression of the conduct and demeanor of a prospective juror during the *voir dire* may provide a legitimate basis for the exercise of a peremptory.").

Given the importance of peremptory challenges, this Court will reverse a conviction where "voir dire [is] so demonstrably brief and lacking in substance as to afford counsel too little information even to draw any conclusions about a potential juror's general outlook, experience, communication skills, intelligence, or life-style." *Lawes*, 292 F.3d at 129. As the Fifth Circuit has said, "Peremptory challenges are worthless if trial counsel is not afforded an opportunity to gain the necessary information upon which to base such strikes." *United States v. Ledee*, 549 F.2d 990, 993 (5th Cir. 1977).

2. **The District Court's perfunctory voir dire prevented defense counsel from being able to exercise peremptory challenges intelligently.**

As discussed, *see* Statement of Facts, § C, *supra*, the District Court's brief individualized voir dire required prospective jurors to respond to only three or four questions: (1) which county or borough did they live in; (2) what did they do for a living; (3) did they have a "significant other"; and (4) if so, what did the "significant other" do for a living. A. 69. The following voir dire responses were typical:

> JUROR [1]: I live in Manhattan. I'm a material coordinator for Mount Sinai Hospital. And I'm a widow.
>
> [ … ]
>
> JUROR [7]: I work for Mount Sinai Health Systems in the communications department for 31 years. I live in Manhattan. I'm single.
>
> [ … ]
>
> JUROR [8]: Good morning. I live in Manhattan. I am in the pharmaceutical industry. My partner works for a financial firm.
>
> [ … ]

> JUROR [10]: Hi. I live in Manhattan. I work in advertising and branding. And my wife works in publishing.

A. 69, 71.

Immediately after hearing these responses, the lawyers were required to exercise their peremptory challenges. *See* A.72-74. But, as Nieves's trial counsel forcefully argued, there was no way he could intelligently exercise peremptory challenges based on these paltry bits of information, particularly since all the prospective jurors' faces were hidden behind masks. A. 73, 116-19. Learning that a prospective juror lives "in Manhattan" and "work[s] in advertising and branding," or "in the pharmaceutical industry," for example, reveals nothing about the person's "general outlook, experience, communication skills, intelligence, or life-style." *Lawes*, 292 F.3d at 129.

This failure to elicit meaningful information was no accident. By design, the District Court "never" asks any questions that might reveal a potential juror's attitudes or beliefs. A. 73, 120-21. But that inflexible practice is a legal error, an "abuse of discretion" by definition. *E.g.*, *Koon v. United States*, 518 U.S. 81, 100 (1996) ("A

district court by definition abuses its discretion when it makes an error of law."). The whole "purpose of voir dire is to enable court and counsel to engage in a rational analysis of a potential juror's *attitudes* regarding a case." *United States v. Haldeman*, 559 F.2d 31, 154 (D.C. Cir. 1976) (per curiam) (emphasis added). That purpose cannot be achieved if a court refuses to allow any questions that could reveal a juror's attitudes. *Cf. Rosales-Lopez*, 451 U.S. at 193 (noting that the trial court properly "questioned the prospective jurors as to their attitudes toward aliens"). As the Seventh Circuit has held, "The defendants must be permitted sufficient inquiry into the background *and attitudes* of prospective jurors to enable them to exercise intelligently their peremptory challenges." *United States v. Harris*, 542 F.2d 1283, 1295 (7th Cir. 1976) (emphasis added); *accord Spells v. United States*, 263 F.2d 609, 611 (5th Cir. 1959). While the voir dire inquiry need not be lengthy or follow any particular script, it must elicit more than the basic pedigree information elicited here.

The voir dire was especially inadequate because, as trial counsel noted, the prospective jurors were all wearing masks. Ordinarily, lawyers would be able to pick up valuable cues from a

60

potential juror's facial expressions. But the masks made that impossible, behooving the District Court to ensure that its voir dire questions would elicit at least some meaningful "attitudinal" information. In rejecting this argument, the District Court committed another legal error. It ruled that no additional information needed to be elicited because it would be improper to exercise peremptory strikes based on jurors' facial expressions. A. 116-17. In fact, the law makes clear that, so long as strikes are not based on race or gender, *see J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994), they may properly be based on demeanor, facial expressions, and even stereotypes. *See, e.g.*, *Brown v. Kelly*, 973 F.2d 116, 121 (2d Cir. 1992) ("An impression of the conduct and demeanor of a prospective juror during the voir dire may provide a legitimate basis for the exercise of a peremptory challenge.") (citing with approval *Barfield v. Orange Cty.*, 911 F.2d 644, 648 (11th Cir. 1990), for the proposition that a peremptory challenge may properly be based on "[h]ostile facial expressions and body language"); *see generally J.E.B.*, 511 U.S. at 142 n.14 (noting that, "[w]here peremptory challenges are made on the basis of group

61

characteristics other than race or gender ..., they do not reinforce the same stereotypes about the group's competence or predispositions that have been used to prevent them from ... contributing to civic life.").

In summary, the District Court committed reversible error under *Lawes* by conducting a voir dire "so demonstrably brief and lacking in substance as to afford counsel too little information even to draw any conclusions about a potential juror's general outlook, experience, communication skills, intelligence, or life-style." 292 F.3d at 129.

### 3.    The District Court's justification for its cursory voir dire was premised on a legal error.

The District Court justified its perfunctory voir dire by stating that the court's role was limited to ensuring that potential jurors "who need to be excused for cause are excused." A. 120. This ruling was another legal error and, therefore, another abuse of discretion.

As this Court has repeatedly held, a court's role in voir dire is *not* merely to ensure that a party has enough information to make cause challenges. A court must *also* ensure that its voir dire is

62

adequate to allow the parties to exercise *peremptory* challenges intelligently. *See, e.g., Colombo*, 869 F.2d at 151 ("[T]here must be sufficient information elicited on *voir dire* to permit a defendant to intelligently exercise *not only his challenges for cause, but also his peremptory challenges*.") (emphasis added); *see also Dellinger*, 472 F.2d at 367 (rejecting the government's argument "that the [trial] court is obligated to inquire only into matters that would disqualify the juror for cause."). This the District Court failed to do — because it misperceived the governing law.

### 4.    The error requires reversal.

Finally on this point, the court's inadequate voir dire requires reversal. Because the error prevented counsel from being able to exercise peremptory challenges intelligently, it defies harmless error analysis. Rather, the error requires reversal without a showing of individualized prejudice. *See Swain,* 380 U.S. at 219 ("The denial or impairment of the right [to peremptory challenges] is reversible error without a showing of prejudice").[7]

---

[7] *United States v. Martinez–Salazar*, 528 U.S. 304 (2000), is not to the contrary. There, the Supreme Court declined to decide whether

### D. Alternatively, the cumulative effect of the District Court's voir dire errors requires reversal.

As demonstrated above, each of the District Court's voir dire errors — its refusal to probe for gang bias and to ask any questions that could reveal a juror's beliefs or attitudes — independently requires reversal. Here, however, *both* errors occurred. Thus, if this Court does not reverse Nieves's conviction based on either of the two voir dire errors standing alone, it should do so based on the cumulative effect of those errors.

---

automatic reversal is required "whenever a defendant's right to a certain number of peremptory challenges is substantially impaired." *Id.* at 317 n.4. In that context, the Court said in dicta that the "oft-quoted [automatic-reversal] language in *Swain* was not only unnecessary to the decision in that case[,] ... but was founded on a series of our early cases decided long before the adoption of harmless-error review." *Id.* This case, unlike *Martinez-Salazar*, does not involve merely the alleged impairment of a "certain number of peremptory challenges." It involves a defective voir dire process that prevented the defendants from exercising their peremptory challenges intelligently. Under these circumstances, the *Swain* "automatic reversal" standard remains applicable. *See United States v. Harbin*, 250 F.3d 532, 547-48 (7th Cir. 2001) (holding, after *Martinez-Salazar*, that the *Swain* "automatic reversal" rule still applies where voir dire errors "prevent[ed] the defendants from intelligently exercising their peremptory challenges" and "crippl[ed] the device designed to ensure an impartial jury").

64

"The Supreme Court has repeatedly recognized that the cumulative effect of a trial court's errors, even if they are harmless when considered singly, may amount to a violation of due process requiring reversal of a conviction. The 'cumulative unfairness' doctrine is also firmly embedded in this Circuit's precedents." *United States v. Al-Moayad*, 545 F.3d 139, 178 (2d Cir. 2008). The doctrine applies where the errors, considered together, "cast such a serious doubt on the fairness of the trial as to warrant reversal." *Id; see also United States v. Haynes*, 729 F.3d 178, 197 (2d Cir. 2013) (holding that the doctrine applies where the "errors call into serious doubt whether the defendant received the due process guarantee of fundamental fairness"); *United States v. Rahman*, 189 F.3d 88, 145 (2d Cir. 1999) ("[T]he effect of multiple errors in a single trial may cast such doubt on the fairness of the proceedings that a new trial is warranted, even if no single error requires reversal.").

Here, the District Court's refusal to probe the venire for gang-related bias, combined with its refusal to ask the prospective jurors any "attitudinal" questions, compels reversal. The cumulative effect of these errors rendered the voir dire process ineffective to weed out

65

bias, and "cast[s] such doubt on the fairness of the proceedings that a new trial is warranted, even if no single error requires reversal." *Rahman*, 189 F.3d at 145.

***

In summary, "even a gang member has a constitutional right to have his case determined on the basis of the evidence of his guilt or innocence, by a jury that is not predisposed to find him guilty solely because of his gang membership." *Jimenez,* 672 N.E.2d at 917. The District Court denied Nieves that right. Even though the court had learned that one prospective juror was biased against gangs, it refused to ask even a single question to determine how many others in the venire felt the same way. Putting efficiency ahead of fundamental fairness, the court did not even permit the potential jurors to know that this was a gang case until after they were selected and sworn. By then, it was too late to screen the jurors for partiality.

The District Court also failed to conduct even a minimally sufficient voir dire that would allow the parties to exercise their

66

peremptory challenges intelligently. These errors, viewed singly or in combination, require a new trial.

## CONCLUSION

This Court should vacate the judgment of conviction and remand for a new trial.

Respectfully submitted,

/s/

Edward S. Zas

Federal Defenders of New York, Inc.
Appeals Bureau
52 Duane Street, 10th Floor
New York, NY 10007
(212) 417-8742
Edward_Zas@fd.org

*Counsel for Christian Nieves*

## CERTIFICATE OF SERVICE

I certify that I have caused this Brief to be filed with the Court's CM/ECF system, which will effect service on all counsel of record.

Dated:    New York, New York
          December 17, 2021


_____/s/_____
**EDWARD S. ZAS**

## CERTIFICATE OF COMPLIANCE

1.  This Brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) and 32(e), and Local Rule 32(a)(4)(A) because:

> this Brief contains 12,839 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2.  This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because:

> this Brief has been prepared in a proportionally spaced typeface using Microsoft Word with 14 characters per inch in Century Schoolbook type style.

Dated:     New York, New York
           December 17, 2021

                              _____/s/_____
                              **EDWARD S. ZAS**

69